**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GENTIVA HEALTH SERVICES, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| PAUL VERHOEVE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>PLAINTIFF'S COMPLAINT</u>

Plaintiff Gentiva Health Services, Inc. ("Gentiva" or the "Company") brings

this Complaint for injunctive relief and monetary damages against Defendant Paul

VerHoeve for breach of contract, fraud, misappropriation of trade secrets under state

law, and violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b).

## <u>INTRODUCTION</u>

1.      This case arises out of Defendant VerHoeve's blatant breaches of his

non-competition and non-solicitation covenants with Gentiva, misappropriation of

trade secrets, and fraud.  Defendant VerHoeve was President, West Region for

Gentiva, a home health and hospice healthcare company headquartered in Atlanta,

Georgia.  In that role, he was responsible for the operation of over 120 locations

throughout an eight-state region, spanning from Louisiana to California, with profit and loss responsibility for several hundred million dollars.

2.    In direct contravention of his contractual obligations, Defendant VerHoeve has now taken Gentiva's operational playbook to a competitor, Mission Healthcare, where he is Chief Executive Officer.  He is trying to achieve a substantial, and unfair, advantage based on his knowledge of Gentiva's employees, trade secrets, and confidential information.  And if that was not bad enough, he has systematically raided Gentiva by hiring 10 Gentiva employees in the last six weeks. He is taking these inappropriate actions despite the fact that he was, by virtue of his own agreement, never eligible to be employed by Mission Healthcare as Chief Executive Officer.

3.    For these reasons, as more fully discussed below, Gentiva is seeking injunctive relief, monetary damages, and attorneys' fees.

## THE PARTIES

4.    Gentiva, which operates under the name Kindred at Home, provides a wide range of healthcare services, including home health and hospice care, to patients throughout the country.  Home health consists of direct home nursing and therapy services operations, including specialty programs.  Hospice serves terminally ill patients and their families.

5.      Gentiva is a Delaware corporation with its principal place of business in Georgia.

6.      Defendant Paul VerHoeve is a citizen of California and resides at 14747 Wild Colt Place, Jamul, California 91935.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action raises claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(c).  This Court also has original jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over Gentiva's state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same operative facts as its federal claims.

8.      Personal jurisdiction and venue are proper in this Court because Defendant VerHoeve's Amended Executive Employment Agreement ("Amended Agreement") provides that "any action arising out of [or] relating to this Amended Agreement shall be litigated exclusively in the state or federal courts located in Atlanta, Georgia."  (Exhibit A attached hereto, Section 14.)

## FACTS

### Defendant VerHoeve's Job Duties

9.     Defendant VerHoeve was the President, West Region for Gentiva, a healthcare company that specializes in providing home health and hospice services. He was responsible for over 120 locations throughout the West Region, which consists of Louisiana, Arkansas, Oklahoma, Texas, New Mexico, Arizona, Nevada, and California.

10.     Defendant VerHoeve had profit and loss ("P&L") responsibility for several hundred million dollars.  He was responsible for setting and monitoring monthly, quarterly, and yearly budgets.

11.     Defendant VerHoeve had direct responsibility for an executive leadership team covering operations, sales, clinical, finance, and human resources. He was also responsible for consumer marketing activities.

12.     By virtue of his position, Defendant VerHoeve learned about, was exposed to, and participated in the development of substantial trade secrets and confidential information belonging to Gentiva regarding its business, products and marketing strategies.  Such trade secrets and confidential information include, but are not limited to, methods of operation, names of customers and payors, referral

sources, patient information, pricing information, financial information and projections, personnel data, and similar information.

13.     For example, Defendant VerHoeve knows the top referral sources in the West Region.  He knows the contract rates with payors, and he knows the contract rate per visit.  He knows the financials for the West Region, specifically how much revenue is generated per month, gross margins, operating expenses and, as a result, how much profit is contributed to the bottom line.  He knows Gentiva's specialty programs, such as Safe Strides, including which of those programs are the most successful and therefore provide a unique advantage in the marketplace.  All of these trade secrets and confidential information are ingrained in his head.

14.     Though Defendant VerHoeve lives in California, he was headquartered out of Gentiva's Phoenix, Arizona office, and he frequently traveled, both throughout the West Region and elsewhere, including regular trips to Gentiva's headquarters in Atlanta, Georgia.

15.     Defendant VerHoeve was highly paid in exchange for performing his job as President, West Region.  His annual salary was $275,000.  He was eligible to receive Short-Term Incentive Plan Cash Awards, Long-Term Incentive Plan Cash Awards, and Equity Awards, and he did receive payments under those plans.

**Defendant VerHoeve's Amended Agreement**

16.    On August 7, 2015, Defendant VerHoeve signed the Amended Agreement (Exhibit A hereto), which has an effective date of July 31, 2015.

17.    Gentiva paid Defendant VerHoeve a one-time, lump sum payment of $100,000, less required withholdings and deductions, in exchange for signing the Amended Agreement.

18.    In Section 9(a) of the Amended Agreement, for a period of twelve months after his separation, Defendant VerHoeve agreed not to compete against Gentiva by performing the same or substantially the same job duties on behalf of a competitor anywhere in the United States:

**(a)    Non-Competition.** While Executive is employed with the Company or its affiliates, and for a period of twelve (12) months after Executive's employment with the Company terminates for any reason (the "Restricted Period"), Executive will not provide, directly or indirectly, Restricted Services in the Territory, whether as an owner, employee, director, officer, independent contractor, or consultant to any person or entity that provides or offers products or services that are the same as or substantially similar to the products and services offered as part of the Company's Business; provided that in no event shall ownership of less than one percent (1%) of the outstanding equity securities of any issuer whose securities are registered under the Securities and Exchange Act of 1934, as amended, standing alone, be prohibited by this Section 9(a). The "Territory" shall mean the territory where Executive is working at the time of termination, which, in light of Executive's access to Company-wide Confidential Information and responsibility for Company-wide operations and performance, Executive acknowledges to include the entire geography in which the Company engages in the Business. "Restricted Services" shall mean management, strategic,

6

operational, financial, and other services that are the same as or substantially similar to the services provided by Executive to the Company during the last two (2) years of Executive's employment with the Company.  Following termination of Executive's employment with the Company, upon request of the Company made while this Section 9(a) is in effect, Executive shall notify the Company of Executive's then-current employment status.

19.    In Section 9(c) of the Amended Agreement, for a period of twelve months after his separation, Defendant VerHoeve agreed not to, directly or indirectly, solicit, induce, lure or attempt to hire away any of Gentiva's employees:

**(c)    Non-Solicitation of Employees.**  Executive agrees that during the Restricted Period, Executive shall not, directly or indirectly, whether on behalf of Executive or others, (i) solicit, lure or attempt to hire away any individual who is an employee of the Company or any of its affiliates, or (ii) solicit or encourage any employee of the Company or any of their affiliates to terminate such individual's employment or breach any restrictive covenant between such employee and the Company or such affiliate.

20.    In Section 8 of the Amended Agreement, Defendant VerHoeve agreed not to use or disclose any of Gentiva's confidential information after his employment ended:

**8.    Nondisclosure of Confidential Information.**  During the course of Executive's employment with the Company, Executive will have access to certain Confidential Information relating to the Business of the Company. During Executive's employment with the Company and thereafter, Executive agrees to hold in confidence and not access, disclose or use for his own benefit, other than such benefit as Executive may derive as an employee of the Company, the Company's Confidential Information.  For purposes of this Amended Agreement, "Confidential Information" means data and information (a) relating to the Business of the Company, regardless of whether the data or information constitutes a trade secret under applicable law, (b)

disclosed to Executive or of which Executive became aware as a consequence of Executive's employment with the Company, (c) having value to the Company, (d) not generally known to competitors of the Company, and (e) which includes trade secrets, methods of operation, names of customers, patient information, price lists, financial information and projections, route books, personnel data, and similar information; provided, however, that such term shall not mean data or information (i) which has been voluntarily disclosed to the public by the Company, except where such public disclosure has been made by Executive without authorization from the Company, (ii) which has been independently developed and disclosed by others, or (iii) which has otherwise entered the public domain through lawful means. In the event that Executive becomes legally compelled to disclose any Confidential Information, whether by subpoena or otherwise, Executive shall provide the Company with written notice of such requirement within twenty-four (24) hours of learning of such obligation (and in any event, prior to any disclosure) to allow the Company to seek a protective order or other remedy. Executive agrees to cooperate with the Company in seeking such protection for Confidential Information. Executive further agrees that any disclosure of Confidential Information pursuant to legal compulsion shall be only to the minimum extent necessary to comply with Executive's legal obligation.

21.     In Section 11 of the Amended Agreement, Defendant VerHoeve agreed to promptly return all of Gentiva's information and property when his employment ended:

> **11.   <u>Return of Company Property.</u>**   Upon termination of Executive's employment for any reason or earlier, upon the Company's request, Executive shall promptly return to the Company all Property (as defined herein) that has been entrusted or made available to Executive by the Company. For purposes of this Amended Agreement, "Property" means all Confidential Information, records, files, electronic storage media, memoranda, reports, price lists, customer lists, drawings, plans, sketches, keys, codes, computer hardware and software, equipment and other property of any kind or description prepared, used or possessed by Executive during Executive's employment with the Company (and any duplicates of any such property), which relate to the

8

Company or its affiliates, or the Company's or its affiliates' business, products or services. Without limiting the generality of the foregoing, Executive understands and agrees that Executive is not permitted to retain any copies, whether digital or paper, of any Confidential Information.

22.    In Section 9(e) of the Amended Agreement, Defendant VerHoeve agreed to a tolling provision that states the one-year period for the non-competition and non-solicitation covenants shall be tolled during the pendency of any lawsuit, including any appeals, regarding the validity, reasonableness, or enforceability of the covenants.

23.    In Section 12 of the Amended Agreement, Defendant VerHoeve agreed that Gentiva is entitled to injunctive relief and monetary damages for any breach:

**12.  Actions.**  The parties agree and acknowledge that the rights conveyed by this Agreement are of a unique and special nature and that the Company will not have an adequate remedy at law in the event of a failure by Executive to abide by its terms and conditions, nor will money damages adequately compensate for such injury.  Therefore, it is agreed between and hereby acknowledged by the parties that, in the event of a breach by Executive of any of the obligations of this Agreement, the Company shall have the right, among other rights, to damages sustained thereby and to obtain an injunction or decree of specific performance from any court of competent jurisdiction to restrain or compel Executive to perform as agreed herein.

**Defendant VerHoeve's Retention Agreement**

24.    On September 22, 2017, Defendant signed an Employee Retention Agreement.  He was offered the Retention Agreement in recognition of the critical skills and contributions that he provided to the Company.

9

25.    Pursuant to the Retention Agreement, if Defendant VerHoeve agreed to remain employed through December 31, 2019, he would receive two payments: (i) a $100,000 payment, less withholdings and deductions, after December 31, 2018 and (ii) another $100,000 payment, less withholdings and deductions, after December 31, 2019.

26.    Even though Defendant VerHoeve signed the Retention Agreement, he did not live up to his end of the bargain.  As discussed below, he abruptly and unexpectedly resigned on August 3, 2018.

**Defendant VerHoeve's August 3, 2018 Resignation**

27.    On August 2, 2018, Defendant VerHoeve was in Atlanta, Georgia for a Company management meeting.  At that meeting, the Company presented an operational realignment where its home health services and hospice services would operate as two separate divisions.  Going forward, Defendant VerHoeve was to serve as the President of the West Region for the hospice division.

28.    To say that Defendant VerHoeve did not take this news well is an understatement.  He was angry and confrontational.

29.    During the evening meetings, he mentioned, for the first time, to various colleagues that he intended to resign from Gentiva.  He indicated that he did not have another job lined up, that he could live off his incentive compensation and

equity payments for a while, and that he did not intend to return to work in the healthcare industry. He also indicated that he had an attorney review his Amended Agreement, who advised him that the restrictive covenants in the Agreement would not be enforceable against him.

30. As the meetings continued, Defendant VerHoeve began to drink heavily and his emotional outbursts continued. At one point, Defendant VerHoeve, began yelling and arguing with another employee, nearing the point of a physical altercation.

31. The next morning, citing his unprofessional behavior the day before, Defendant VerHoeve told colleagues that he would resign. He followed through that same morning by emailing Gentiva's Chief Executive Officer stating that he was resigning and also offering to work a 30-day notice period.

32. Defendant VerHoeve stopped working for Gentiva a few days later. Nevertheless, Gentiva continued to pay Defendant VerHoeve his salary through the end of August 2018.

33. In addition, on August 24, 2018, Gentiva paid Defendant VerHoeve $440,085 as follows: $97,600 for Long Term Incentive Compensation, $35,000 for severance pay, and $307,485 for Unvested Restricted Share Compensation. Shortly thereafter, Gentiva also paid him $44,375 for his unused Paid Time Off. And, on

11

November 7, 2018, Gentiva paid him $10,817.70 pursuant to a deferred compensation plan.

**Defendant VerHoeve's Unlawful Competitive Activities**

34.    Gentiva recently learned that Defendant VerHoeve is the Chief Executive Officer of Mission Healthcare in San Diego, California.    His representations that he did not have another job lined up and that he would not return to work in the healthcare industry were apparently false.

35.    Mission Healthcare is a direct competitor of Gentiva, and Defendant VerHoeve is violating his non-competition covenant by virtue of being employed as its Chief Executive Officer.

36.    On April 23, 2019, Mission Healthcare announced a new private equity investment in the company, crediting the new leadership of Defendant VerHoeve. As one of the principals of the investor put it, "Mission Healthcare is poised for growth and has significant upside for both its home health and hospice services. Under the leadership of new CEO Paul Ver Hoeve II, the company is well-positioned to scale operations and drive performance improvement."  HCAP invests in Mission Healthcare, PE  HUB  (2019),  https://www.pehub.com/2019/04/hcap-invests-in-mission-healthcare/ (last visited Apr 29, 2019).

37.     Without the aid of discovery, it is not possible for Gentiva to know when Defendant VerHoeve first began communicating with Mission Healthcare, planning to join it, or helping to grow it.  But it has been discovered that on June 25, 2018 at 10:22 a.m., Defendant VerHoeve emailed his resume from his company email address to his personal email address.  One minute later, he emailed Gentiva's National Map to his personal email address, and it includes handwritten revenue numbers and other information for all regions; and, then another minute later, he emailed organizational charts for West Region leadership, West Region sales, and West Region home health to his personal email address.  Defendant VerHoeve resigned only six weeks later.

38.     On August 9, 2018, unaware of the foregoing emails, counsel for Gentiva sent Defendant VerHoeve a letter reminding him of his obligations in the Amended Agreement not to use or disclose confidential information, not to compete, and not to solicit employees or solicit customers.  The letter also reminded Defendant VerHoeve of his obligation in the Amended Agreement to return all company property in his possession.  Defendant VerHoeve never responded to the letter.  After the letter, Defendant VerHoeve never returned the information that he emailed to himself on June 25, 2018 or any other trade secrets or confidential information in his possession.

13

39.    After Defendant VerHoeve joined Mission Healthcare, Mission Healthcare began a campaign of raiding employees from Gentiva's San Diego, California office.  Mission Healthcare hired Medical Director Dr. Enoch Wang in April 2019 (just last week), Executive Director Kate Mohney in March 2019, Hospice Specialist Toni Abad in April 2019, Clinical Practice Manager Sarah Breckner in April 2019, LVN Jenny Mariano in April 2019, Hospice Aide Mayra Meza in April 2019, Admissions Nurse Aglika Mitchem in April 2019, Hospice RN Maria Parubrub in April 2019, LVN Sibonnet Finnegan in April 2019 (starting with Mission Healthcare in May 2019), and Aide Nayely Molina in April 2019 (starting with Mission Healthcare in May 2019).

40.    These employees would not have resigned from Gentiva if Defendant VerHoeve were complying with his non-competition covenant and not working for Mission Healthcare.  Moreover, Gentiva also believes that Defendant VerHoeve has breached his non-solicitation covenant by, directly or indirectly, soliciting some or all of these employees.

41.    Defendant VerHoeve has solicited another employee, Jackie Hughes, who is the AVP-Finance for the West Region.  Defendant VerHoeve spoke to Ms. Hughes and told her, "You know, I have an open CFO position."  He also told her what the salary would be.

14

42.    It is not just the number of employees being lost but also the quality of employee.  For example, one of the employees mentioned above, Toni Abad, was a Hospice Specialist, which is a sales position.  She was one of Gentiva's top sales employees—not just in California—but for the entire country.  She was the face of the Company in the San Diego market.  She was part of the sales team that promoted Gentiva's hospice services to the local healthcare community and developed key business relationships.  She was regularly in the community educating people and developing relationships with healthcare professionals.  She made phone calls and conducted presentations to potential referral sources.  She created strategic marketing plans.  She worked side-by-side with the clinical and operational team to promote Gentiva's hospice services and solidify the highest quality patient care.

43.    Gentiva also believes that Mission Healthcare unsuccessfully attempted to recruit its other employees, including Hospice RN Rowena Culas and LVN Steve Sandoval.  Gentiva had to give Ms. Culas and Mr. Sandoval additional pay to keep them.

44.    In sum, Defendant VerHoeve has taken Gentiva's operational playbook to Mission Healthcare and that, no doubt, is why it hired him.  He knows the top referral sources in the West Region, he knows the contract rates with payors, he knows the contract rate per visit, and he knows specialty programs.  He also knows

the financials for the West Region, including monthly revenues, gross margins, operating expenses and profit. And, he knows the employees (or their supervisors) who can be lured away to execute the operational playbook. He is trying to achieve a substantial, and unfair, advantage based on his knowledge of Gentiva's trade secrets and confidential information.

## COUNT I
## DEFENDANT'S BREACH OF CONTRACT (AMENDED AGREEMENT)

45.    The allegations of the foregoing paragraphs are incorporated by reference with the same force and effect as if set forth in full below.

46.    Defendant VerHoeve knowingly and voluntarily entered into a legally binding and enforceable Amended Agreement for which he was provided valuable consideration.

47.    Gentiva has performed all conditions, covenants, and promises required of it under the terms of the Amended Agreement.

48.    Georgia law applies to the Amended Agreement because it contains a Georgia choice-of-law clause. The non-competition, employee non-solicitation, non-disclosure covenants in the Amended Agreement are reasonable and enforceable pursuant to O.C.G.A. § 13-8-50, *et seq*. The return of property covenant is also enforceable pursuant to Georgia law.

16

49.     The non-competition, employee non-solicitation, and non-disclosure covenants in the Amended Agreement are reasonable and necessary to protect Gentiva's legitimate business interests.

50.     The non-competition, employee non-solicitation, non-disclosure, and return of property covenants in the Amended Agreement are justified by Gentiva's legitimate business interests in:

(a)     protecting its confidential information and trade secrets;

(b)     protecting its client relationships, payor relationships, referral source relationships and other competitive advantages in the marketplace;

(c)     promoting productivity and maintaining competent and specialized personnel.

51.     As a proximate result of Defendant VerHoeve's breach of the Amended Agreement, Gentiva has suffered and will continue to suffer injuries and harm unless this Court enjoins Defendant VerHoeve, and anyone acting in concert with him, from continuing to breach the Amended Agreement and orders them to comply with it.

52.     Defendant VerHoeve should be enjoined from providing services to Mission Healthcare or any other business that are the same as or substantially similar to the services he provided to Gentiva as President, West Region.  Defendant should

17

be enjoined from, directly or indirectly, soliciting, luring away or attempting to hire away any of Gentiva's employees and independent contractors.

53.     The one-year time period for the non-competition and non-solicitation covenants in the Amended Agreement should be tolled during the pendency of this lawsuit.

54.     As a proximate result of the above described conduct, Gentiva has suffered monetary damages in excess of $75,000 and in an amount to be determined at trial.

## COUNT II
## DEFENDANT'S VIOLATION OF THE DEFEND TRADE SECRETS ACT

55.     The allegations of the foregoing paragraphs are incorporated by reference with the same force and effect as if set forth in full below.

56.     The Defend Trade Secrets Act ("DTSA") of 2016 forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

57.     "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information."

58.     During his employment, Defendant had access to confidential and proprietary information which constitute Gentiva's trade secrets.  As described

above, this includes, but was not limited to information methods of operation, names of customers and payors, referral sources, patient information, pricing information, financial information and projections, personnel data, and similar information.

59.    Defendant VerHoeve shared this information with Mission Healthcare, or used this information himself, in order to directly compete with Gentiva.

60.    This information was related to multiple products or services used in, or intended for use in, interstate commerce.

61.    This information: 1) is not known outside Gentiva; 2) is known only by Gentiva employees and others involved in the business; 3) is subject to reasonable measures to guard the secrecy of the information, including technology, policies, and written agreements; 4) is valuable; and 5) is difficult for others to properly acquire or independently duplicate.

62.    Defendant VerHoeve knew that he had a duty to maintain the secrecy of Gentiva's trade secrets.

63.    Defendant VerHoeve's actions constitute actual, threatened and/or continuing misappropriation in violation of the DTSA.

64.    Gentiva has suffered damages and irreparable harm as a result of Defendant VerHoeve's breaches of the DTSA.

65.    Gentiva is entitled to recover actual damages.

19

66. Gentiva's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable and compensatory relief. Defendant VerHoeve's actions will continue to cause irreparable harm and damages to Gentiva if not restrained.

## COUNT III
## DEFENDANT'S VIOLATION OF UNIFORM TRADE SECRETS ACT

67. The allegations of the foregoing paragraphs are incorporated by reference with the same force and effect as if set forth in full below.

68. During his employment with Gentiva, Defendant VerHoeve had access to, and became knowledgeable about, Gentiva's trade secrets.

69. These trade secrets are not readily available to the public, and give Defendant VerHoeve an advantage in the market.

70. Gentiva protects its trade secrets from unauthorized use or disclosure by limiting access to its information, and requiring employees to sign agreements.

71. Gentiva's trade secrets are highly valuable to Gentiva and would provide a distinct unfair competitive advantage to any competitor. Gentiva derives independent economic value from its trade secrets not being generally known or ascertainable by competitors in the healthcare industry.

20

72.    As a direct and proximate result of Defendant VerHoeve's misappropriation or threatened misappropriation of Gentiva's trade secrets, Gentiva has suffered irreparable harm and monetary damages.

73.    Pursuant to both the Georgia and California Uniform Trade Secrets Acts, Gentiva is entitled to injunctive relief, damages, and recovery of attorneys' fees and costs.

## COUNT IV
## FRAUD

74.    The allegations of the foregoing paragraphs are incorporated by reference with the same force and effect as if set forth in full below.

75.    At the time Defendant VerHoeve resigned, he indicated that he did not have another job lined up, that he could live off his incentive compensation and equity payments for a while, and that he would not return to work in the healthcare industry.  Those representations were false and were intended to hide the fact that we would work for Mission Healthcare.  Gentiva relied upon his misrepresentations and did not take any additional action after sending Defendant VerHoeve the August 9, 2018 letter.  Gentiva's reliance was justified but, unfortunately, it has now been damaged by Defendant VerHoeve's secret activities.

76.    Accordingly, Gentiva is entitled to compensatory damages and punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the foregoing acts and conduct complained of in Counts I through IV, Gentiva demands judgment in its favor and against Defendant VerHoeve for injunctive relief and damages, and respectfully requests the following:

(1)    A trial by jury;

(2)    An injunction that enjoins Defendant VerHoeve, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Mission Healthcare from:

    (a)    using and/or disclosing any of Gentiva's trade secrets and confidential information;

    (b)    performing for Mission Healthcare job duties that are the same as or substantially the same as the job duties he performed for Gentiva during his last two years of employment;

    (b)    soliciting, luring, or attempting to hire away any employees or independent contractors of Gentiva; and

    (c)    destroying, erasing, or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or

22

information maintained in computer files or other electronic storage media) that relates to the claims in this case.

(3)   That Defendant VerHoeve, and anyone acting in concert or participation with him, be further ordered to return to Gentiva's counsel any and all records or information pertaining to Gentiva's customers, trade secrets, or business which were obtained from Gentiva as a result of employment with Gentiva, whether in original, copied, handwritten or any other form, and purge any such information from their possession, custody, or control, within 24 hours of the Court's Order.

(4)   An accounting by Defendant VerHoeve of all profits earned as a result of each of his efforts in violation of his Amended Agreement;

(5)   Actual monetary damages incurred by Gentiva as a result of Defendant VerHoeve's wrongful conduct;

(6)   Punitive damages;

(7)   Attorneys' fees; and,

(8)   Any other relief that the Court deems appropriate and proper.

Respectfully submitted this 29th day of April, 2019.

*/s/ C. Todd Van Dyke*
C. Todd Van Dyke
Georgia Bar No. 723420
vandyket@jacksonlewis.com
Sapna K. Jain
Georgia Bar No. 680949

23

sapna.jain@jacksonlewis.com
JACKSON LEWIS P.C.
171 17th Street NW
Suite 1200
Atlanta, Georgia  30363
Telephone: (404) 525-8200
Facsimile: (404) 525-1173

***Counsel for Plaintiff***

## <u>CERTIFICATION</u>

In accordance with Civil Local Rules 5.1C and 7.1D, I hereby certify that this document has been prepared in 14 point, Times New Roman Font.