**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GENTIVA HEALTH SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:19-cv-01912-MLB |
| PAUL VERHOEVE, | ) ) ) | |
| Defendant. | ) | |

**Plaintiff's Motion for Temporary Restraining Order
With Supporting Memorandum of Law**

I.   **Introduction**

Gentiva brings this action and now moves the Court for a Temporary Restraining Order against its former President, West Region, Paul VerHoeve, because VerHoeve is blatantly breaching his non-competition and non-solicitation covenants as the newly-installed Chief Executive Officer of one of Gentiva's direct competitors, Mission Healthcare.

Up until last August, Gentiva employed Paul VerHoeve as its President, West Region. In that senior leadership role, VerHoeve was in charge of one of Gentiva's three regions—overseeing home health and hospice operations in ten states that were responsible for several hundred million dollars in revenue.

VerHoeve was paid well for his efforts. In 2018, his last year with the company, VerHoeve enjoyed more than $600,000 in total compensation.

VerHoeve's employment with Gentiva ended in August 2018, after Gentiva allowed VerHoeve to resign following an unprofessional, angry spectacle that he caused at a company-wide meeting in Atlanta. In addition to forgoing termination, Gentiva also opted to pay VerHoeve hundreds of thousands of dollars that, had he been terminated, would not have been due.

Despite being treated very well by Gentiva, VerHoeve is now violating his non-competition, employee non-solicitation, and return of property obligations. He has taken Gentiva's operational playbook to Mission Healthcare. He is trying to achieve a substantial, and unfair, advantage based on his knowledge of Gentiva's employees, trade secrets, and confidential information. He is systematically raiding Gentiva by hiring ten Gentiva employees in the last several weeks, which is how Gentiva first learned that he is competing against it, and unsuccessfully soliciting several more.

For these reasons, Gentiva requests the Court issue a TRO:

- Restraining VerHoeve from, directly or indirectly, providing to Mission Healthcare, or any competitor, management, strategic, operational, financial, and other services that are the same as or substantially similar to the services that he provided to Gentiva during his last two years of employment. This restriction should be limited to

> Gentiva's West Region, as it was defined during VerHoeve's tenure: California, Nevada, Arizona, New Mexico, Texas, Arkansas, Washington, Idaho, Oregon and Colorado.

- Restraining Defendant VerHoeve from, directly or indirectly, soliciting, luring, or attempting to hire away any individual who is an employee of Gentiva and also restraining him from soliciting or encouraging any employee of Gentiva to terminate such individual's employment with Gentiva; and

- Ordering VerHoeve to immediately return all of Gentiva's property, including trade secrets and confidential information.

## II.    Background[1]

### A.  VerHoeve's Job Duties

Gentiva, which operates under the name Kindred at Home, provides a wide range of healthcare services, including home health and hospice care, to patients throughout the country. (Complaint ¶4). Home health consists of direct home nursing and therapy services operations, including specialty programs. (Complaint ¶4). Hospice serves terminally ill patients and their families. (Complaint ¶4).

VerHoeve was the President, West Region for Gentiva. (Complaint ¶9). He was responsible for over 120 locations throughout the West Region, which con-

---

[1] Gentiva has attached a declaration that verifies the facts in this section.

sists of California, Nevada, Arizona, New Mexico, Texas, Arkansas, Washington, Idaho, Oregon, and Colorado. (Complaint ¶9).

VerHoeve had profit and loss ("P&L") responsibility for several hundred million dollars. (Complaint ¶10). He was responsible for setting and monitoring monthly, quarterly, and yearly budgets. (Complaint ¶10). He had direct responsibility for an executive leadership team covering operations, sales, clinical, finance, and human resources. (Complaint ¶11). He was also responsible for consumer marketing activities. (Complaint ¶11).

By virtue of his position, VerHoeve learned about, was exposed to, and participated in the development of substantial trade secrets and confidential information belonging to Gentiva regarding its business, products, and marketing strategies. (Complaint ¶12). Such trade secrets and confidential information include, but are not limited to, methods of operation, names of customers and payors, referral sources, patient information, pricing information, financial information and projections, personnel data, and similar information. (Complaint ¶12).

For example, VerHoeve knows the top referral sources in the West Region. (Complaint ¶13). He knows the contract rates with payors, and he knows the contract rate per visit. (Complaint ¶13). He knows the financials for the West Re-

4

gion, specifically how much revenue is generated per month, gross margins, operating expenses and, as a result, how much profit is contributed to the bottom line. (Complaint ¶13). He knows Gentiva's specialty programs, such as Safe Strides, including which of those programs are the most successful and therefore provide a unique advantage in the marketplace. (Complaint ¶13). All of these trade secrets and confidential information are ingrained in his head. (Complaint ¶13).

Though VerHoeve lives in California, he was headquartered out of Gentiva's Phoenix, Arizona office, and he frequently traveled, both throughout the West Region and elsewhere, including regular trips to Gentiva's headquarters in Atlanta, Georgia. (Complaint ¶14). Specifically, he traveled to Georgia 37 days for business between 2015 (the year the Amended Agreement was signed) and his resignation in 2018. He also would have had countless other emails and telephone calls with Gentiva's headquarters in Georgia.

Gentiva paid VerHoeve handsomely for performing his job as President, West Region. (Complaint ¶15). His annual salary was $275,000. (Complaint ¶15). He was eligible to receive Short-Term Incentive Plan Cash Awards, Long-Term Incentive Plan Cash Awards, and Equity Awards, and he did receive payments under those plans. (Complaint ¶15).

**VerHoeve's Amended Agreement**

On August 7, 2015, VerHoeve signed the Amended Agreement (Exhibit A hereto), which has an effective date of July 31, 2015. (Complaint ¶16). Gentiva paid VerHoeve a one-time, lump sum payment of $100,000, less required with-holdings and deductions, in exchange for signing the Amended Agreement. (Complaint ¶17).

In Section 9(a) of the Amended Agreement, for a period of just twelve months after his separation, VerHoeve agreed not to compete against Gentiva by performing the same or substantially the same job duties on behalf of a competi-tor anywhere in the United States:

> **(a)    Non-Competition.** While Executive is employed with the Company or its affiliates, and for a period of twelve (12) months after Executive's employment with the Company terminates for any reason (the "Restricted Period"), Executive will not provide, directly or indirectly, Restricted Ser-vices in the Territory, whether as an owner, employee, director, officer, in-dependent contractor, or consultant to any person or entity that provides or offers products or services that are the same as or substantially similar to the products and services offered as part of the Company's Business; provided that in no event shall ownership of less than one percent (1%) of the outstanding equity securities of any issuer whose securities are regis-tered under the Securities and Exchange Act of 1934, as amended, standing alone, be prohibited by this Section 9(a). The "Territory" shall mean the territory where Executive is working at the time of termination, which, in light of Executive's access to Company-wide Confidential Information and responsibility for Company-wide operations and performance, Executive

6

acknowledges to include the entire geography in which the Company engages in the Business. "Restricted Services" shall mean management, strategic, operational, financial, and other services that are the same as or substantially similar to the services provided by Executive to the Company during the last two (2) years of Executive's employment with the Company. Following termination of Executive's employment with the Company, upon request of the Company made while this Section 9(a) is in effect, Executive shall notify the Company of Executive's then-current employment status.

(Complaint ¶18).

In Section 9(c) of the Amended Agreement, again for a period of twelve months after his separation, VerHoeve agreed not to, directly or indirectly, solicit, induce, lure, or attempt to hire away any of Gentiva's employees:

> **(c) Non-Solicitation of Employees.** Executive agrees that during the Restricted Period, Executive shall not, directly or indirectly, whether on behalf of Executive or others, (i) solicit, lure or attempt to hire away any individual who is an employee of the Company or any of its affiliates, or (ii) solicit or encourage any employee of the Company or any of their affiliates to terminate such individual's employment or breach any restrictive covenant between such employee and the Company or such affiliate.

(Complaint ¶19).

In Section 8 of the Amended Agreement, VerHoeve agreed not to use or disclose any of Gentiva's confidential information after his employment ended:

> **8. Nondisclosure of Confidential Information.** During the course of Executive's employment with the Company, Executive will have access to certain Confidential Information relating to the Business of the Company.

7

During Executive's employment with the Company and thereafter, Executive agrees to hold in confidence and not access, disclose or use for his own benefit, other than such benefit as Executive may derive as an employee of the Company, the Company's Confidential Information. For purposes of this Amended Agreement, "Confidential Information" means data and information (a) relating to the Business of the Company, regardless of whether the data or information constitutes a trade secret under applicable law, (b) disclosed to Executive or of which Executive became aware as a consequence of Executive's employment with the Company, (c) having value to the Company, (d) not generally known to competitors of the Company, and (e) which includes trade secrets, methods of operation, names of customers, patient information, price lists, financial information and projections, route books, personnel data, and similar information; provided, however, that such term shall not mean data or information (i) which has been voluntarily disclosed to the public by the Company, except where such public disclosure has been made by Executive without authorization from the Company, (ii) which has been independently developed and disclosed by others, or (iii) which has otherwise entered the public domain through lawful means. In the event that Executive becomes legally compelled to disclose any Confidential Information, whether by subpoena or otherwise, Executive shall provide the Company with written notice of such requirement within twenty-four (24) hours of learning of such obligation (and in any event, prior to any disclosure) to allow the Company to seek a protective order or other remedy. Executive agrees to cooperate with the Company in seeking such protection for Confidential Information. Executive further agrees that any disclosure of Confidential Information pursuant to legal compulsion shall be only to the minimum extent necessary to comply with Executive's legal obligation.

(Complaint ¶20).

In Section 11 of the Amended Agreement, VerHoeve agreed to promptly return all of Gentiva's information and property when his employment ended:

**11. <u>Return of Company Property.</u>** Upon termination of Executive's employment for any reason or earlier, upon the Company's request, Executive shall promptly return to the Company all Property (as defined herein) that has been entrusted or made available to Executive by the Company. For purposes of this Amended Agreement, "Property" means all Confidential Information, records, files, electronic storage media, memoranda, reports, price lists, customer lists, drawings, plans, sketches, keys, codes, computer hardware and software, equipment and other property of any kind or description prepared, used or possessed by Executive during Executive's employment with the Company (and any duplicates of any such property), which relate to the Company or its affiliates, or the Company's or its affiliates' business, products or services. Without limiting the generality of the foregoing, Executive understands and agrees that Executive is not permitted to retain any copies, whether digital or paper, of any Confidential Information.

(Complaint ¶21).

In Section 9(e) of the Amended Agreement, VerHoeve agreed to a tolling provision that states the one-year period for the non-competition and non-solicitation covenants shall be tolled during the pendency of any lawsuit, including any appeals, regarding the validity, reasonableness, or enforceability of the covenants. (Complaint ¶22).

In Section 12 of the Amended Agreement, VerHoeve agreed that Gentiva is entitled to injunctive relief and monetary damages for any breach:

9

**12. <u>Actions.</u>** The parties agree and acknowledge that the rights conveyed by this Agreement are of a unique and special nature and that the Company will not have an adequate remedy at law in the event of a failure by Executive to abide by its terms and conditions, nor will money damages adequately compensate for such injury. Therefore, it is agreed between and hereby acknowledged by the parties that, in the event of a breach by Executive of any of the obligations of this Agreement, the Company shall have the right, among other rights, to damages sustained thereby and to obtain an injunction or decree of specific performance from any court of competent jurisdiction to restrain or compel Executive to perform as agreed herein.

(Complaint ¶23).

**<u>VerHoeve's Retention Agreement</u>**

On September 22, 2017, Defendant also signed an Employee Retention Agreement. (Complaint ¶24). He was offered the Retention Agreement in recognition of the critical skills and contributions that he provided to the Company. (Complaint ¶24). Pursuant to the Retention Agreement, if VerHoeve agreed to remain employed through December 31, 2019, he would receive two payments: (i) a $100,000 payment, less withholdings and deductions, after December 31, 2018 and (ii) another $100,000 payment, less withholdings and deductions, after December 31, 2019. (Complaint ¶25).

Even though VerHoeve signed the Retention Agreement, he did not live up to his end of the bargain. As discussed below, he abruptly and unexpectedly resigned on August 3, 2018. (Complaint ¶26).

**VerHoeve's August 3, 2018 Resignation**

On August 2, 2018, VerHoeve was in Atlanta, Georgia for a Company management meeting. (Complaint ¶27). At that meeting, the Company presented an operational realignment where its home health services and hospice services would operate as two separate divisions. (Complaint ¶27). Going forward, VerHoeve was to serve as the President of the West Region for the hospice division. (Complaint ¶27). To say that VerHoeve did not take this news well is an understatement. (Complaint ¶28). He was angry and confrontational. (Complaint ¶28).

During the evening meetings, he mentioned, for the first time, to various colleagues that he intended to resign from Gentiva. (Complaint ¶29). He indicated that he did not have another job lined up, that he could live off his incentive compensation and equity payments for a while, and that he did not intend to return to work in the healthcare industry. (Complaint ¶29). He also indicated that he had an attorney review his Amended Agreement, who advised him that the

11

restrictive covenants in the Agreement would not be enforceable against him. (Complaint ¶29).

As the meetings continued, VerHoeve began to drink heavily and his emotional outbursts continued. (Complaint ¶30). At one point, VerHoeve began yelling and arguing with another employee, nearing the point of a physical altercation. (Complaint ¶30).

The next morning, citing his unprofessional behavior the day before, VerHoeve told colleagues that he would resign. (Complaint ¶31). He followed through that same morning by emailing Gentiva's Chief Executive Officer stating that he was resigning and also offering to work a 30-day notice period. (Complaint ¶31). Gentiva graciously allowed VerHoeve the opportunity to resign, despite grounds to terminate VerHoeve for cause based on his behavior at a Company-wide gathering.

A few days after tendering his notice, VerHoeve stopped working for Gentiva. (Complaint ¶32). Nevertheless, Gentiva continued to pay VerHoeve his salary through the end of August 2018. (Complaint ¶32).

In addition, on August 24, 2018, Gentiva paid VerHoeve $440,085 as follows: $97,600 for Long Term Incentive Compensation, $35,000 for severance pay, and $307,485 for Unvested Restricted Share Compensation. (Complaint ¶33).

12

Shortly thereafter, Gentiva also paid him $44,375 for his unused Paid Time Off. (Complaint ¶33). And, on November 7, 2018, Gentiva paid him $10,817.70 pursuant to a deferred compensation plan. (Complaint ¶33).

**VerHoeve's Unlawful Competitive Activities**

Gentiva recently learned that VerHoeve is the Chief Executive Officer of Mission Healthcare in San Diego, California. (Complaint ¶34). His representations that he did not have another job lined up and that he would not return to work in the healthcare industry were apparently false. (Complaint ¶34). Mission Healthcare is a direct competitor of Gentiva, and VerHoeve is violating his non-competition covenant by virtue of being employed as its Chief Executive Officer. (Complaint ¶35).

On April 23, 2019, Mission Healthcare announced a new private equity investment in the company, crediting the new leadership of VerHoeve. (Complaint ¶36). As one of the principals of the investor put it, "Mission Healthcare is poised for growth and has significant upside for both its home health and hospice services. (Complaint ¶36). Under the leadership of new CEO Paul Ver Hoeve II, the company is well-positioned to scale operations and drive performance improvement." (Complaint ¶36). HCAP invests in Mission Healthcare, PE HUB

13

(2019), https://www.pehub.com/2019/04/hcap-invests-in-mission-healthcare/ (last visited Apr 29, 2019). (Complaint ¶36).

Without the aid of discovery, it is not possible for Gentiva to know when VerHoeve first began communicating with Mission Healthcare, planning to join it, or helping to grow it. (Complaint ¶37). Gentiva recently discovered that, on June 25, 2018 at 10:22 a.m., VerHoeve emailed his resume from his company email address to his personal email address. (Complaint ¶37). One minute later, he emailed Gentiva's National Map to his personal email address, and it includes handwritten revenue numbers and other information for all regions; and, then another minute later, he emailed organizational charts for West Region leader-ship, West Region sales, and West Region home health to his personal email ad-dress. (Complaint ¶37). VerHoeve resigned only six weeks later. (Complaint ¶37).

Shortly after VerHoeve's resignation, Gentiva, unaware of the foregoing emails, sent VerHoeve a letter reminding him of his obligations in the Amended Agreement not to use or disclose confidential information, not to compete, and not to solicit employees or customers. (Complaint ¶38). The letter also reminded VerHoeve of his obligation in the Amended Agreement to return all company property in his possession. (Complaint ¶38). VerHoeve never responded to the

letter. (Complaint ¶38). After the letter, VerHoeve never returned the information that he emailed to himself on June 25, 2018 or any other trade secrets or confidential information in his possession. (Complaint ¶38).

After VerHoeve joined Mission Healthcare, Mission Healthcare recently began a campaign of raiding employees from Gentiva's San Diego, California office. (Complaint ¶39). Mission Healthcare hired Medical Director Dr. Enoch Wang in April 2019, Executive Director Kate Mohney in March 2019, Hospice Specialist Toni Abad in April 2019, Clinical Practice Manager Sarah Breckner in April 2019, LVN Jenny Mariano in April 2019, Hospice Aide Mayra Meza in April 2019, Admissions Nurse Aglika Mitchem in April 2019, Hospice RN Maria Parubrub in April 2019, LVN Sibonnet Finnegan in April 2019 (starting with Mission Healthcare in May 2019), and Aide Nayely Molina in April 2019 (starting with Mission Healthcare in May 2019). (Complaint ¶39).

These employees would not have resigned from Gentiva if VerHoeve were complying with his non-competition covenant and not working for Mission Healthcare. (Complaint ¶40). Moreover, Gentiva also believes that VerHoeve has breached his non-solicitation covenant by, directly or indirectly, soliciting some or all of these employees. (Complaint ¶40).

VerHoeve has solicited another employee, Jackie Hughes, who is the AVP-Finance for the West Region. (Complaint ¶41). VerHoeve spoke to Ms. Hughes and told her, "You know, I have an open CFO position." (Complaint ¶41). He also told her what the salary would be. (Complaint ¶41).

It is not just the number of employees being lost but also the quality of employee. (Complaint ¶42). For example, one of the employees mentioned above, Toni Abad, was a Hospice Specialist, which is a sales position. (Complaint ¶42). She was one of Gentiva's top sales employees—not just in California—but for the entire country. (Complaint ¶42). She was the face of the Company in the San Diego market. (Complaint ¶42). She was part of the sales team that promoted Gentiva's hospice services to the local healthcare community and developed key business relationships. She was regularly in the community educating people and developing relationships with healthcare professionals. (Complaint ¶42). She made phone calls and conducted presentations to potential referral sources. (Complaint ¶42). She created strategic marketing plans. (Complaint ¶42). She worked side-by-side with the clinical and operational team to promote Gentiva's hospice services and solidify the highest quality patient care. (Complaint ¶42).

Gentiva also believes that Mission Healthcare unsuccessfully attempted to recruit its other employees, including Hospice RN Rowena Culas and LVN Steve

Sandoval. (Complaint ¶43). Gentiva had to give Ms. Culas and Mr. Sandoval additional pay to keep them. (Complaint ¶43).

Unfortunately, at Gentiva's San Diego location, VerHoeve's tactics are working. Hospice admissions from patients have dropped off significantly since VerHoeve joined Mission Healthcare.

In sum, VerHoeve has taken Gentiva's operational playbook to Mission Healthcare and that, no doubt, is why it hired him. (Complaint ¶44). He knows the top referral sources in the West Region, he knows the contract rates with payors, he knows the contract rate per visit, and he knows specialty programs. (Complaint ¶44). He also knows the financials for the West Region, including monthly revenues, gross margins, operating expenses and profit. (Complaint ¶44). And, he knows the employees (or their supervisors) who can be lured away to execute the operational playbook. (Complaint ¶44). He is trying to achieve a substantial, and unfair, advantage based on his knowledge of Gentiva's trade secrets and confidential information. (Complaint ¶44).

### III.   Memorandum of Law

#### A.   Gentiva is Entitled to a Temporary Restraining Order

##### 1.   Legal Standard

Georgia's Restrictive Covenant Act states that a "court **shall** enforce a restrictive covenant by any appropriate and effective remedy available at law or equity, **including, but not limited to, temporary and permanent injunctions.**" O.C.G.A. § 13-8-58(c) (emphasis added).

Before granting a Temporary Restraining Order ("TRO"), pursuant to Rule 65 of the *Federal Rules of Civil Procedure*, federal courts must consider (1) whether there is a substantial likelihood of success on the merits; (2) whether the TRO is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm that the TRO would cause to Defendant; and (4) whether the TRO would be adverse to the public interest. *In Wells Fargo Ins. Servs. USA v. Gupton*, No. 1:13-CV-0520-SCJ, 2013 U.S. Dist. LEXIS 190019, at *6 (N.D. Ga. Mar. 4, 2013); *Arthur J. Gallagher Serv. Co v. Egan*, 514 Fed. Appx. 839, 842 (11th Cir. 2013).

##### 2.   Georgia Law Applies

Section 14 of the Amended Agreement states that it "shall be governed by, and construed in accordance with, the laws of the State of Georgia, excluding any

18

conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this Amended Agreement to the substantive law of another jurisdiction." Choice of law clauses are enforceable if there are "significant contacts" with the State of Georgia. *Convergys Corp. v. Keene*r, 276 Ga. 808, 810 (2003).[2]

Here, there are significant contacts with the State of Georgia. Gentiva is headquartered in Georgia. VerHoeve's contractual violations negatively impact the company in Georgia. VerHoeve made regular trips to Gentiva's headquarters in Georgia. Specially, he traveled to Georgia 37 days for business between 2015 (the year the Amended Agreement was signed) and his resignation in 2018. He also would have had other emails and telephone calls with Gentiva's headquarters in Georgia. VerHoeve was also at a management meeting in Georgia when he resigned and made certain misrepresentations about his future work plans, which give rise to Gentiva's fraud claim.

For these reasons, the choice of law clause is enforceable because there are significant contacts with the State of Georgia.[3]

---

[2] The Georgia Supreme Court has rejected the more stringent "center of gravity" test found in the Restatement (Second) of Conflict of Law § 187. *Id.* at 810.

[3] Section 14 of the Amended Agreement also contains an exclusive venue selection clause that states, "The parties agree that any action arising out of [or] relat-

### 3.    Gentiva Will Succeed on the Merits

Gentiva can establish a breach of contract claim because VerHoeve has (1) breached Paragraph 9(a) of the Amended Agreement by working for Mission Healthcare as Chief Executive Officer, (2) breached Paragraph 9(c) of the Amended Agreement by soliciting, luring or attempting to hire away Gentiva's employees, and (3) breached Paragraph 11 of the Amended Agreement by not returning all of the Company's property after his resignation.

### i.    The Non-Competition Covenant is Enforceable

Georgia's Restrictive Covenant Act (the "GRCA") applies to agreements signed after May 11, 2011, so it applies to the Amended Agreement which was signed in 2015. *Kennedy v. Shave Barber Co.*, 348 Ga. App. 298, 301 (2018). Pursuant to the GRCA, a "court shall construe a restrictive covenant to comport with the reasonable intent and expectations of the parties to the covenant and in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforceable." O.C.G.A. § 13-8-54(a).

---

ing to this Amended Agreement shall be litigated exclusively in the state or federal courts located in Atlanta, Georgia." That clause is also enforceable. *See Atlantic Marine Construction Company, Inc. v. United States District Court for the Western District of Texas*, 134 S. Ct. 568 (2013).

(a) <u>VerHoeve can be bound by a non-competition cove-</u>

<u>nant</u>

The GRCA limits the types of employees who can be bound by a non-competition covenant. O.C.G.A. § 13-8-53(a); *Blair v. Pantera Enterprises, Inc.*, 824 S.E.2d 711 (Ga. Ct. App. 2019). Defendant VerHoeve can be bound by a non-competition covenant under two statutory categories – managerial employee and key employee. First, as President, West Region, he had "a primary duty of managing the enterprise in which [he was] employed or of a customarily recognized department or subdivision thereof"; he "[c]ustomarily and regularly direct the work of two or more other employees; and he had "the authority to hire or fire other employees or ha[d] particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees." O.C.G.A. § 13-8-53(a)(3).

Second, as President, West Region, VerHoeve "[p]erform[ed] the duties of a key employee . . . ." O.C.G.A. § 13-8-53(a)(4). The term "key employee" is defined in the Act as "an employee who, by reason of the employer's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships during the course of the employee's employment with the employer . . . is intimately involved in the planning for or di-

rection of the business of the employer or a defined unit of the business of the employer. Such term also means an employee in possession of selective or specialized skills, learning, or abilities or customer contacts or customer information who has obtained such skills, learning, abilities, contacts, or information by reason of having worked for the employer." O.C.G.A. § 13-8-51(8).

### (b) VerHoeve's non-compete is enforceable

Prior to 2011, Georgia's Constitution forbade the General Assembly from authorizing restrictive covenants, and such covenants were disfavored. *Kennedy*, 348 Ga. App. at 301, n.1. But that changed. A constitutional amendment, approved and ratified in 2010, empowered the General Assembly to enact laws authorizing and regulating restrictive covenants in employment contracts. *Id.* The General Assembly exercised that authority and enacted the Act. *Id.*

In the GRCA, the General Assembly recognizes that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests . . . ." O.C.G.A. § 13-8-50; *Kennedy*, 348 Ga. App. at 301. The General Assembly expressed its intent "to provide statutory guidance so that all parties to such agreements may be certain of the validity and enforceability of such provisions and may know their rights and duties according to such provisions." *Id.* The GRCA requires a court's construc-

tion of a restrictive covenant "to comport with the reasonable intent and expectations of the parties to the covenant and in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." O.C.G.A. § 13-8-54(a); *id*.

Pursuant to the GRCA, a non-competition covenant is enforceable if it is reasonable in time, scope of activities, and geographic area. O.C.G.A. § 13-8-53(a). VerHoeve's non-competition covenant is reasonable in all three areas.

*Time period is reasonable:* The non-competition covenant is limited to twelve months from the end of employment. (Amended Agreement, Paragraph 9(a)). Pursuant to the GRCA, two years or less is presumptively reasonable. O.C.G.A. § 13-8-57(b). The non-competition covenant is also tolled during the pendency of any lawsuit. (Amended Agreement, Paragraph 9(e)). As a result, at the appropriate time, Gentiva will request that the Court extend the non-competition covenant through August 2020. That two year period from the end of VerHoeve's employment is also presumptively reasonable pursuant to the GRCA.

*Scope of activities is reasonable:* VerHoeve is only restricted from providing "management, strategic, operational, financial, and other services that are the same as or substantially similar to the services" he provided to Gentiva during

23

his last two years of employment. (Amended Agreement, Paragraph 9(a)).[4] Pursuant to the GRCA, the scope of activities are "sufficiently described if a reference to the activities, products, or services is provided and qualified by the phrase 'of the type conducted, authorized, offered, or provided within two years prior to termination' or similar language." O.C.G.A. § 13-8-53(c)(2). The Georgia Court of Appeals has upheld a nearly identical non-competition covenant that prevented the former employee from "selling or providing the services the same or similar to that provided by" the former employee. *Kennedy*, 348 Ga. App. at 305-306.

*Geographic restriction is reasonable:* VerHoeve is restricted from providing competing services in "the entire geography" where Gentiva does business (Amended Agreement, Paragraph 9(a)), which is nationwide except for Alaska, Hawaii, Idaho, Montana, North Dakota, South Dakota, Utah, Vermont and Wyoming. Pursuant to the Act, language describing a geographic restriction is sufficient "if the person or entity bound by the restraint can reasonably determine the maximum reasonable scope of the restraint at the time of the termination." O.C.G.A. §13-8-53(c)(2). The Act specifically provides that a "geographic territory

---

[4] Further, the non-competition only restricts Defendant VerHoeve's employment opportunities with competitors who offer "products or services that are the same as or substantially similar to the products and services offered as part of the Company's Business." (Amended Agreement, Paragraph 9(e)).

which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable provided that: (A) The total distance encompassed by the provisions of the covenant also is reasonable . . . ." O.C.G.A. § 13-8-56(2)(A).[5]

The geographic restriction in the Amended Agreement is sufficient because VerHoeve could reasonably determine the maximum reasonable scope of the restraint at the time of his separation in August 2018. O.C.G.A. §13-8-53(c)(2). As President, West Region, he was familiar with everywhere Gentiva conducts business. In fact, as discussed above, he emailed a nationwide map of Gentiva's regions and locations to his personal email address only six weeks before he resigned.

Nonetheless, the Act states that a "post-employment covenant shall be construed ultimately to cover only so much of . . . the geographic areas actually involved within a reasonable period of time prior to termination." O.C.G.A. §13-8-53(c)(2). As a result, for purposes of this TRO, Gentiva requests entry of an injunction that applies only to the West Region for which VerHoeve was responsi-

---

[5] The Act further states that "[w]henever a description of activities, products, or services, or geographic areas, is required by this Code section, any description that provides fair notice of the maximum reasonable scope of the restraint shall satisfy such requirement . . . ." O.C.G.A. § 13-8-53(c)(1).

ble. The West Region, as it was defined under VerHoeve, consisted of California, Nevada, Arizona, New Mexico, Texas, Arkansas, Washington, Idaho, Oregon, and Colorado.[6]

For these reasons, the non-competition covenant is reasonable as to time, scope of activities and territory, and it should be enforced.

(c) <u>Gentiva's legitimate business interests</u>

A business seeking enforcement of a non-competition covenant must plead and prove the existence of one or more legitimate business interests. O.C.G.A. § 13-8-55. Legitimate business interests include, but are not limited to, trade secrets, confidential information, substantial relationships with existing and prospective customers, patients, vendors or clients, and customer or patient good will in a particular geographic region. O.C.G.A. § 13-8-51(9).

Gentiva seeks to enforce the non-competition covenant to protect trade secrets, confidential information, employee relationships, and customer/patient relationships. VerHoeve knows Gentiva's trade secrets and confidential information. (Complaint, ¶¶ 12-13). VerHoeve knows Gentiva's employees in the West Region and is already using those relationships to raid Gentiva. (Com-

_____

[6] The Act states that "a court shall not refuse to enforce the provisions of a restrictive covenant because . . . [Gentiva] has not proven that the covenant has been violated . . . as to the entire geographic area of the covenant." O.C.G.A. § 13-8-56(3).

plaint, ¶¶ 39-43). VerHoeve certainly helped establish Gentiva's good will and reputation in the West Region. Lastly, at Gentiva's San Diego location, hospice admissions from patients have dropped off significantly since VerHoeve joined Mission Healthcare, so Gentiva also seeks to protect relationships with its current and prospective clients and patients.

For these reasons, Gentiva has established legitimate business reasons that justify the non-competition covenant.

### ii. The Employee Non-Solicitation Covenant is Enforceable

In Section 9(c) of the Amended Agreement, for a period of one year after his employment ends, Defendant VerHoeve agreed not to "solicit, lure or attempt to hire away any individual who is an employee" of Gentiva or "solicit or encourage any employee of the Company . . . to terminate such individual's employment . . . ."

This restriction is reasonable and enforceable. In *Harrison v. Sarah Coventry*, the Georgia Supreme Court upheld a similar covenant in which a former employee agreed not to "solicit or in any manner attempt to induce Sarah Coventry's salespeople or employees to leave the company." 228 Ga. 169, 170 (1971).

27

More recently, in *CMGRP, Inc. v. Gallant*, the Georgia Court of Appeals upheld a similar covenant in which a former employee agreed not to "solicit any employee of the Company to leave such employ to" work for the former employee, or "induce or encourage any such employee of the Company to leave the employment of the Company to joint any other company . . . ." 343 Ga. App. 91, 95 (2017). The Court of Appeals held that an employee non-solicitation covenant need not contain a geographic restriction or be limited to employees with whom the departing employee had contact. *Id.* at 95-98.

For these reasons, the employee non-solicitation clause is enforceable.

### iii.     The Return of Property Clause is Enforceable

In Section 11 of the Amended Agreement, VerHoeve agreed to return all company property. "Property" is defined as "all Confidential Information, records, files, electronic storage media, memoranda, reports, price lists, customer lists, drawings, plans, sketches, keys, codes, computer hardware and software, equipment and other property of any kind or description prepared, used or possessed by Executive during Executive's employment with the Company (and any duplicates of any such property), which relate to the Company or its affiliates, or the Company's or its affiliates' business, products or services."

This clause is reasonable and should be enforced.

**4.**  **Gentiva Will Suffer Irreparable Harm Without an Injunction**

An injury or harm is "irreparable" only if it cannot be undone by monetary remedies. *Farrero v. Associated Materials, Inc.* 923 F.2d 1441, 1449 (11th Cir. 1991). If VerHoeve is permitted to compete against Gentiva, the Company will lose its investment in good will, employees, patients, and trade secrets and confidential information. VerHoeve has taken Gentiva's operational playbook to a competitor, Mission Healthcare, and he is trying to achieve a substantial, and unfair, advantage based on his knowledge of Gentiva's employees, trade secrets, and confidential information. This injury would be difficult, if not impossible, to determine monetarily.

Consequently, in Section 12 of the Amended Agreement, VerHoeve agreed that "the rights conveyed by this Agreement are of a unique and special nature and that the Company will not have an adequate remedy at law in the event of a failure by Executive to abide by its terms and conditions, nor will money damages adequately compensate for such injury. Therefore, it is agreed between and hereby acknowledged by the parties that, in the event of a breach by Executive of any of the obligations of this Agreement, the Company shall have the right, among other rights, to damages sustained thereby and to obtain an injunction or

29

decree of specific performance from any court of competent jurisdiction to restrain or compel Executive to perform as agreed herein."

**5.     The Balance of Harm Weighs Heavily in Gentiva's Favor**

As stated above, in the absence of a TRO, Gentiva will suffer the loss of business, patients, goodwill, and income. Conversely, VerHoeve will suffer no legally recognizable harm if a TRO is entered, because it would merely prohibit him from engaging in activity which he was contractually prohibited from doing in the first place. Entering a TRO will merely maintain the status quo until a preliminary injunction hearing is held.

Accordingly, the balance of equities clearly weighs in favor of granting Gentiva's Motion for TRO.

**6.     The Public Interest Will Be Advanced by Issuing the Order**

Injunctive relief affirmatively serves the public interest by preserving faith in valid contractual agreements that businesses routinely make with their employees to rightfully protect their confidential information, trade secrets, goodwill, employee relationships and patient/customer relationships. In the GRCA, the General Assembly recognized that "reasonable restrictive covenants contained in employment and commercial contracts serve the legitimate purpose of protecting legitimate business interests and creating an environment that is fa-

vorable to attracting commercial enterprises to Georgia and keeping existing businesses within the state." O.C.G.A. § 13-8-50. Accordingly, the entry of a TRO will serve the public interest.

## IV.   Conclusion

For all of the foregoing reasons, Gentiva respectfully requests the Court issue a TRO providing the following relief:

a)   Restraining VerHoeve from providing to Mission Healthcare or any competitor, management, strategic, operations, financial, and other services that are the same as or substantially similar to the services that he provided to Gentiva during his last two years of employment. This restriction is limited to California, Nevada, Arizona, New Mexico, Texas, Arkansas, Washington, Idaho, Oregon, and Colorado.

b)   Restraining Defendant VerHoeve from soliciting, luring, or attempting to hire away any individual who is an employee of Gentiva and restraining him from soliciting or encouraging any employee of Gentiva to terminate such individual's employment with Gentiva;

c)   Ordering VerHoeve to immediately return all of Gentiva's property, which is defined as all Confidential Information, records, files, electronic storage media, memoranda, reports, price lists, customer lists, drawings, plans, sketches,

31

keys, codes, computer hardware and software, equipment, and other property of any kind or description prepared, used or possessed by him during his employment with the Company (and any duplicates of any such property), which relate to the Company or its affiliates, or the Company's or its affiliates' business, products, or services;

d)      Restraining VerHoeve, his agents, and employees from using, printing, copying, distributing, disclosing, possessing, examining, or destroying any information taken from or belonging to Gentiva, whether or not in original form;

e)      Ordering VerHoeve to deliver any phone and computer capable of storing Gentiva's information, or that could have been used to solicit with Gentiva's employees, to Gentiva's counsel for forensic image within three (3) days of the date of this Order.

Respectfully submitted this 9th day of May, 2019.

/s/ C. Todd Van Dyke
C. Todd Van Dyke
Georgia Bar No. 723420
vandyket@jacksonlewis.com
Sapna K. Jain
Georgia Bar No. 680949
sapna.jain@jacksonlewis.com
JACKSON LEWIS P.C.
171 17th Street NW
Suite 1200
Atlanta, Georgia 30363

32

Telephone: (404) 525-8200
Facsimile: (404) 525-1173

*Counsel for Plaintiff*

## <u>CERTIFICATION</u>

In accordance with Civil Local Rules 5.1C and 7.1D, I hereby certify that this document has been prepared in 13 point, Book Antigua Font.

## **VERIFICATION**

I am duly authorized to verify the Background Section in Plaintiff's Motion for Temporary Restraining Order. I am employed by Gentiva Health Services, Inc. as President, West Region. The facts stated in the Background Section have been assembled with assistance from Gentiva Health Services, Inc's representatives. The facts provided consist of information compiled from a variety of sources and are true and correct to the best of my personal knowledge and belief.

I declare, under penalty of perjury, that the foregoing is true and correct. 28 U.S.C. §1746.

Dated: 5-9-19              By: _____